DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**SHERARD ADAMS,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D17-966

[July 24, 2019]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Martin J. Bidwill, Judge; L.T. Case No. 13-014515 CF10A.

Samuel R. Halpern, Fort Lauderdale, and Arthur E. Marchetta, Jr., Fort Lauderdale, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Mark J. Hamel, Assistant Attorney General, West Palm Beach, for appellee.

MAY, J.

The defendant appeals his conviction and sentence for first degree murder. He argues the trial court erred in admitting: (1) a co-defendant's statements because they lacked indicia of trustworthiness and violated the Confrontation Clause; (2) letters written by the defendant in jail and parts of a book authored by the defendant; and (3) a recorded phone call between the victim's father and the defendant. We agree with him in part and reverse and remand the case for a new trial.

The State charged the defendant and co-defendant with murder in the first degree. The trial court severed their cases. The co-defendant ultimately confessed to his involvement, but claimed the defendant threatened him into doing it and paid him for it. He provided the State with a testimonial proffer in exchange for his plea to a reduced charge and

his agreement to testify against the defendant at trial. The defendant entered a not guilty plea.

Prior to trial, the defendant moved in limine to preclude the admission of the co-defendant's statements and recorded conversations in which he inculpated the defendant. The motion also sought to exclude the defendant's taped telephone conversation with the victim's father, letters he wrote from jail to the co-defendant and another inmate, and parts of his authored book (*The Prince of Pentium*). The court denied the motion.

At trial, the victim's neighbor testified that he heard gunshots on the night of the murder. He looked outside and saw a man driving a blue-and-white motorcycle down the street.

Before the State called the victim's father to testify, the defendant renewed his objection to the introduction of the recorded phone call between him and the victim's father the day after the murder. The trial court overruled the objection.

The victim's father explained the defendant had previously dated his daughter. On the night of the murder, the defendant called to speak with her. She told her father the defendant would be coming over to meet with her outside. Her father asked her not to go out.

About ten to fifteen minutes after his daughter went outside, the father heard several gunshots and a motorcycle speeding away. When he went outside, he saw his daughter lying on the ground.

After the paramedics arrived, the father went into the house to get dressed and follow the ambulance. The phone began ringing. When the answering machine picked up, he heard the defendant's voice asking what happened. The defendant continued to call the victim's father numerous times after he returned from the hospital.

The next day two detectives came to the victim's home. The defendant called again while the detectives were there. They recorded the call.

The trial court admitted the recorded phone call, which revealed the defendant continuously asking the victim's father what happened the night before. The victim's father accused him of shooting the victim; the defendant adamantly denied being involved. The father called the defendant a liar, a punk, and a junkie.

After the call, the defendant reached out to the detectives and agreed to talk to them. During his conversation with them, the defendant admitted to talking to the victim on the night of the murder. He agreed to stop by and see her, but claimed he never came by. Instead, he went to a friend's home on his motorcycle. He denied shooting the victim or knowing who shot her. The detectives saw a white motorcycle with blue lights parked at the defendant's house.

As the State prepared to call the co-defendant to testify, the co-defendant presented a letter to the court. In the letter he claimed he never killed the victim. He completely recanted his prior statements. The trial court read the letter and gave copies to both parties. The State advised the court the co-defendant was unwilling to testify against the defendant, and asked the court to declare him unavailable.

In lieu of the co-defendant's live testimony, the State offered the testimony of the co-defendant's friend[1] and his recorded conversations with the co-defendant. The co-defendant told his friend that he killed the victim by shooting her five times in the chest and the defendant paid him to do it. He provided other details of the murder including the use of the defendant's motorcycle, where he shot the victim, the type of gun used, and where he got rid of the gun. He said the victim "knew too much" and assumed that is why the defendant hired him to do the job.

Upon his fiancée's urging, the friend met with the police. He agreed to record his conversations with the co-defendant, and was paid for doing so. The State entered these recordings into evidence over defense counsel's objections.

In the recorded conversations made in casual settings, the co-defendant told the informant that the defendant wanted the victim's entire family dead. He explained how he felt driving away from the scene of the crime. He admitted that he and the defendant drank beer, smoked pot, and/or took Xanax, but denied that they were incoherent during the conversations.

The trial court also allowed the State to admit several letters written by the defendant over defense counsel's objections. In these letters, the

---

[1] This conversation occurred prior to the co-defendant's friend becoming an informant.

defendant references characters, Prince and Pistol G, from the defendant's book *Prince of Pentium.* A forensic document examiner verified the defendant's handwriting.

While in custody, the defendant sent the letters to the co-defendant and another inmate in the same facility. They contained threats to the co-defendant's girlfriend, suggested that he was a snitch and was talking too much. He encouraged the co-defendant to tell the truth and admit that neither of them were involved in the murder. The co-defendant provided some of the letters to his attorney.

To explain the characters referenced in the letters, the State admitted a portion of the defendant's book, again over defense counsel's objection. The trial court commented that the book had probative value to give context to the reference to Pistol G within the letters.

The jury found the defendant guilty. He moved for a new trial, which the court denied. The defendant now appeals.

We review decisions on the admission of evidence for an "'abuse of discretion, limited by the rules of evidence.'" *Lucas v. State*, 67 So. 3d 332, 335 (Fla. 4th DCA 2011) (citation omitted). "In considering a trial court's ruling on admissibility of evidence over an objection based on the Confrontation Clause, our standard of review is *de novo.*" *McWatters v. State*, 36 So. 3d 613, 637 (Fla. 2010) (citation omitted).

- ***THE CO-DEFENDANT'S STATEMENTS AGAINST PENAL INTEREST***

The defendant argues the trial court erred in admitting the co-defendant's out-of-court statements because they lacked the required "particularized guarantees of trustworthiness" and violated the Confrontation Clause. The State responds that the statements were not testimonial and not subject to *Crawford v. Washington*, 541 U.S. 36 (2004). It also argues the statements qualified as statements against the declarant's penal interest under section 90.804(2)(c), Florida Statutes (2016). The statements possessed those guarantees of trustworthiness because they were made to a longtime friend in a personal setting and his descriptions matched police-gathered information.

4

o *The Confrontation Clause*

In *Lilly v. Virginia*, 527 U.S. 116 (1999), the Court discussed hearsay statements in the context of the Confrontation Clause. "[T]he veracity of hearsay statements is sufficiently dependable to allow the untested admission of such statements against an accused when (1) 'the evidence falls within a firmly rooted hearsay exception' or (2) it contains 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements reliability." *Id.* at 124-25 (quoting *Ohio v. Roberts*, 448 U.S. 56, 66 (1980)).

The Court categorized statements against penal interest: "(1) as voluntary admissions against the declarant; (2) as exculpatory evidence offered by a defendant who claims that the declarant committed, or was involved in, the offense; and (3) as evidence offered by the prosecution to establish the guilt of an alleged accomplice of the declarant." *Id.* at 127.

The Court indicated that statements which fall within category (3) "are presumptively unreliable," causing them to fall outside the realm of firmly rooted exceptions to the hearsay rule. *Id.* at 131. And when they do so, the statements "must possess indicia of reliability by virtue of [their] inherent trustworthiness" to be admitted. *Id.* at 138. The Court held that the statements in *Lilly* lacked the requisite indicia of reliability. *Id.* at 148-149.

The Court would subsequently carve out a new set of rules for those statements deemed testimonial. *See Crawford*, 541 U.S. 36. Reviewing the historical need and purpose for the Confrontation Clause, the Court would require "unavailability and a prior opportunity for cross-examination" before a testimonial statement is admitted. *Id.* at 68. "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69.

The defendant argues the admission of the co-defendant's statements to the informant violated the Confrontation Clause because the defendant did not have an opportunity to confront the co-defendant to fairly and adequately test his credibility. The State responds the statements were not testimonial and therefore did not violate the Confrontation Clause.

"The Sixth Amendment of the United States Constitution guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Camacho v. State*, 192 So. 3d 568, 570 (Fla. 4th DCA 2016) (citation omitted). "The Confrontation Clause bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Edwards-Freeman v. State*, 93 So. 3d 497, 499 (Fla. 4th DCA 2012) (citations omitted). However, "[w]hen a statement is not testimonial it 'is not subject to the Confrontation Clause.'" *Brown v. State*, 69 So. 3d 316, 319 (Fla. 4th DCA 2011) (citation omitted).

In determining if statements are testimonial, a court should look at whether the statements:

> (1) 'were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' (2) 'establish or prove past events potentially relevant to later criminal prosecution,' or (3) were 'procured with a primary purpose of creating an out-of-court substitute for trial testimony.'

*Jackson-Johnson v. State*, 188 So. 3d 133, 141 (Fla. 4th DCA 2016) (citations omitted). "Most courts agree that a spontaneous statement to a friend or family member is not likely to be testimonial under *Crawford*." *Brown*, 69 So. 3d at 319.

Here, the circumstances surrounding the co-defendant's initial statement to the informant indicate they were not testimonial. The co-defendant and informant had a long-standing friendship. They grew up in the same neighborhood and hung out together. The co-defendant initially voluntarily confessed to his friend before he began working for the police. The co-defendant was not interrogated and did not make the statements in anticipation of litigation.

The subsequent recorded conversations were at the behest of law enforcement, but the co-defendant was unaware of that fact. Recording the statements for possible later use in police investigations does not automatically make them testimonial. *Jackson-Johnson*, 188 So. 3d at 141.

The co-defendant made the statements in confidence within personal settings. He did not know the informant was recording him; he did not know the informant was working with the police. He made the statements on his own initiative, giving details of the murder without any prompting. In short, the statements were spontaneous; not testimonial. *See Jackson-Johnson*, 188 So. 3d at 133. Because these statements were not testimonial, *Crawford* does not apply.

But, "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Crawford,* 541 U.S. at 68. Enter Florida law on non-testimonial statements against penal interest.

o *Non-Testimonial Statements Inculpating the Defendant*

The defendant initially sought to exclude the co-defendant's statements in their entirety, but the motion also suggested the court extricate the inculpating statements against the defendant from the inculpating statements against the co-defendant.

In supplemental briefing, the defendant specifically argues the court erred in not redacting the statements inculpating the defendant. The State responds that: (1) the issue is unpreserved; (2) the statements are inextricably intertwined and were necessary to explain the crime to the jury; and (3) the defense objection was forfeited due to the defendant's wrongdoing in threatening the co-defendant through his letters, causing his unavailability.

We disagree with the State that the issue was unpreserved although we admit the defendant has been more focused on the redaction issue in his supplemental briefing. This brings us to the merits of the defendant's argument.

The hearsay exception for statements against penal interest can be found in section 90.804(2)(c), Florida Statutes, which provides:

c) Statement against interest.—A statement which, at the time of its making, . . . tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a person in the declarant's position would not have made the statement unless he or she believed it to be true.

7

Here, the co-defendant was unavailable because he refused to testify in the middle of trial and recanted his prior confession and proffered testimony. Some of his statements were self-inculpating. Those statements fit within section 90.804(2)(c). But the declarant's other statements inculpated the defendant. It is the admission of those statements[2] that created the error.

Our supreme court addressed statements against penal interest in *Brooks v. State*, 787 So. 2d 765 (Fla. 2001). There, the defendant argued the court erred in admitting a co-defendant's statements to investigators which inculpated the defendant. *Id.* at 770. Specifically, the co-defendant's statement placed the defendant in the car with the co-defendant and victim on the night of the murders. *Id.* at 774.

The supreme court indicated that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule. . . ." *Id.* at 775. For this reason, it is "highly unlikely that a prosecutor will be able to establish 'particularized guarantees of trustworthiness." *Id.* at 776 (citing Charles W. Ehrhardt, *Florida Evidence* § 804.4 (2000 ed.)).

The court held it was error to admit the statements because they "were predominately self-serving in attempting to shift blame, and thus lacked the necessary 'guarantees of trustworthiness.'" *Id.* at 777. Indeed, "a nontestifying codefendant or accomplice's confession or inculpatory statement which also implicates the defendant should **only** be admitted if it 'sensibly and fairly can be redacted to include only those statements which are solely self-inculpatory.'" *Id.* at 775 (emphasis added) (citing *Franqui v. State*, 699 So. 2d 1332, 1339 (Fla. 1997) (Anstead, J., concurring in part and dissenting in part)).

Recently, we held that an unavailable co-defendant's statement against interest was admissible, but only to the extent the statement was self-

_____

[2] While most of the recorded conversations had little to do with the murder and were redacted, the co-defendant reconfirmed many of the details that he had told his friend before law enforcement became involved. He was inconsistent in some of the facts however; e.g., what he was paid, his relationship with the defendant, and why he shot the victim. The defendant had the opportunity to, and did, cross-examine the informant extensively regarding the co-defendant's drug use and inconsistent statements.

inculpating. That part of the statement that inculpated the defendant was inadmissible unless the statements were inextricably intertwined. *Moscatiello v. State*, 247 So. 3d 11, 21 (Fla. 4th DCA 2018)[3] (discussing *Brooks v. State*, 787 So. 2d 765 (Fla. 2001)).

In *Moscatiello,* we noted our two prior decisions, which held the entirety of a co-defendant's statement admissible, including parts that inculpated the defendant. Neither of those opinions discussed whether those nonself-inculpating statements should be redacted. *See Machado v. State*, 787 So. 2d 112 (Fla. 4th DCA 2001); *see also Brown v. State*, 69 So. 3d 316 (Fla. 4th DCA 2011). For this reason, we distinguished those cases.

*Machado* predated our supreme court's decision in *Brooks*, but on rehearing found *Brooks* factually distinguishable. *Brown* also determined *Brooks* to be factually distinguishable because the statements in *Brooks* had been made to law enforcement, but the statements in *Brown* had been made to a friend, thereby providing the requisite "particularized guarantees of trustworthiness." *Brown*, 69 So. 3d at 319.

*Brooks* used a legal pen to draw a line of demarcation in the landscape of admissibility between statements inculpating the declarant and statements inculpating another. No longer would a "particularized guarantees of trustworthiness" analysis permit the admission of statements inculpating someone other than the declarant if the statements were not inextricably intertwined.[4] As noted by the concurrence, those particularized guarantees serve as the basis for the hearsay exceptions themselves.

---

[3] This case is now pending in the Supreme Court of Florida. The jurisdictional briefs have been filed. The State has argued that *Moscatiello* conflicts with *Brooks*. *Moscatiello v. State*, 247 So. 3d 11, 21 (Fla. 4th DCA 2018) (discretionary jurisdiction pending SC18-1431).

[4] Our supreme court has defined "inextricably intertwined" evidence as

> evidence [that] is admissible because it is a *relevant* and *interwoven* part of the conduct that is at issue. Where it is impossible to give a complete or intelligent account of the criminal episode without reference to other uncharged crimes or bad conduct, such evidence may be used to cast light on the primary crime or elements of the crime at issue.

*Wright v. State*, 19 So. 3d 277, 292 (Fla. 2009).

After *Brooks,* that part of a statement that inculpates another must be redacted. The reasons are simple: inculpating another is not a statement against the declarant's penal interest, and as *Lilly* instructed, such statements rarely have "particularized guarantees of trustworthiness."

Here, the co-defendant's statements inculpating the defendant were the glue that held all the evidentiary pieces of the murder crime together. Yet, the statements were not inextricably intertwined. The statements concerning the co-defendant's participation in the murder did not require the defendant's payment to him or threat against him to explain the crime. The court erred in failing to extricate the inculpating statements against the defendant from the statements against the co-defendant's penal interest. *See Brooks*, 787 So. 2d 765; *Moscatiello*, 247 So. 3d 11.[5]

o *The Possibility of Forfeiture*

The State nevertheless argues the defendant forfeited his hearsay objection when he threatened the co-defendant's girlfriend and family in letters. "The forfeiture-by-wrongdoing exception to hearsay 'is a codification of the common law rule that one who wrongfully procures the absence of a witness from court cannot complain of the admission of the hearsay statement of the witness.'" *Joseph v. State*, 250 So. 3d 113, 120 (Fla. 4th DCA 2018) (citation omitted). This doctrine is newly codified in section 90.804(2)(f), which allows the admission of "[a] statement offered against a party that wrongfully caused, or acquiesced in wrongfully causing, the declarant's unavailability as a witness, and did so intending that result." § 90.804, Fla. Stat. (2016).

The trial court did not have the opportunity to rule on the forfeiture issue because it denied the defendant's motion to exclude the statements. Should the State again try to admit the co-defendant's statements, the court can hear and rule on whether the defendant's hearsay objection is forfeited.

- ***THE DEFENDANT'S LETTERS AND BOOK***

The defendant next argues the trial court improperly admitted defendant's letters and parts of a book he authored as consciousness of

---

[5] We note the trial court did not have the benefit of *Moscatiello*, which was decided long after the trial.

guilt.  The State responds that the letters were relevant to show the defendant's attempt to prevent the co-defendant from testifying, and parts of the book were necessary and relevant to explain character references within the letters.

"A defendant's behavior is circumstantial evidence probative of his consciousness of his guilt, and ultimately guilt itself, only when it can be said that the behavior is 'susceptible of no prima facie explanation except consciousness of guilt.'" *Herring v. State*, 501 So. 2d 19, 20 (Fla. 3d DCA 1986) (citation omitted).  "'Evidence of conduct . . . of the accused which demonstrates a consciousness of guilt is relevant since it supplies the basis for an inference that the accused is guilty of the offense.'" *Hayward v. State*, 24 So. 3d 17, 39 (Fla. 2009), *as revised on denial of reh'g* (Dec. 10, 2009) (citation omitted).

The defendant wrote to the co-defendant and another inmate housed in the same facility.  He advised the other inmate that the co-defendant was "running his mouth," and about to testify against him.  In retaliation, he threatened to commit a sexual act on the co-defendant's girlfriend.

The defendant argues these letters were evidence only of an innocent person trying to take reasonable steps to correct an injustice.  However, these letters collectively showed the defendant's consciousness of guilt.  He urged the co-defendant to recant, to tell the truth, and suggested the co-defendant's statements had been made while he was under the influence.  He asked him to write a letter to the defendant's attorney admitting that neither of them were involved in the crime.  He told the co-defendant to say that he was just trying to impress the informant, and was trying to be a character in the defendant's book.

He attempted to influence his testimony.  He told the co-defendant his mother did not raise him to be a rat, suggesting he should not implicate the defendant.  His letter to the inmate indicated the co-defendant was "running his mouth," which put a target on the co-defendant in a jail facility as a snitch.  He wrote that the co-defendant was lying to get a deal.

Within these letters, the defendant referenced characters in his book. To understand those references, the trial court allowed the State to introduce parts of the book.  *Kirkman v. State*, 233 So. 3d 456, 467 (Fla. 2018).  We see no error in the admission of the letters or the parts of the defendant's book to explain the meaning of words within the letters.

While the letters and book themselves may have been prejudicial, that prejudice must be weighed against their probative value to determine if the prejudice was unfair. "Unfair prejudice" has been described as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Brown v. State,* 719 So. 2d 882, 885 (Fla. 1998) (citation omitted). This rule of exclusion "is directed at evidence which inflames the jury or appeals improperly to the jury's emotions." *Steverson v. State,* 695 So. 2d 687, 688–89 (Fla. 1997).

Here, the letters were redacted. They were relevant to show the defendant's consciousness of guilt. They explained why the co-defendant recanted his story. The trial court admitted only one chapter of the book to give context to the characters in the letters. They did not appeal to the jurors' emotions. The trial court struck the perfect balance between admitting relevant probative evidence and the resulting prejudice to the defendant.

- ***THE RECORDED PHONE CONVERSATION WITH THE VICTIM'S FATHER***

In his last issue, the defendant argues the trial court erred in admitting the phone conversation between the defendant and the victim's father shortly after the murder. The State responds the phone conversation was not unfairly prejudicial because the jury understood the victim's father believed the defendant was involved in the murder, and the court instructed the jury to disregard the father's opinions.

"[A] witness's opinion as to the guilt or innocence of the accused is not admissible." *Martinez v. State,* 761 So. 2d 1074, 1079 (Fla. 2000). "'Any probative value such an opinion may possess is clearly outweighed by the danger of unfair prejudice.'" *Id.* (citation omitted).

The defendant claims the recorded call was highly prejudicial because the victim's father called him a liar five times, a punk twice, and a junkie once. He also adamantly conveyed his opinion of the defendant's guilt throughout the phone call.

- "You shot her. You shot her. Cause you don't seem to care."

- "I heard you come up, I heard you drive away. I heard you shoot her."

- "Look, she was going out to meet you, she wound up dead, they seen a motorcycle drive away. I guess it's you, Prince."

- "I know you shot her, Prince."

- "It's f___ed up that you shot her."

We agree with the defendant that the recorded conversation including the victim's father's opinions should not have been admitted. The father's comments were not probative of anything other than his opinions. The court's attempt to ameliorate the prejudice through its instruction to the jury did not cure the prejudice caused by the recording's admission.

- ***A SUMMARY***

In summary, we find error in the admission of the co-defendant's statements that inculpated the defendant. There was no error in the admission of the redacted letters written by the defendant and the admission of part of his book. The court erred in admitting the recorded phone conversation between the victim's father and the defendant. We cannot say these errors were harmless. *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986).

For these reasons, we reverse and remand the case for a new trial.

*Reversed and Remanded for a new trial.*

DAMOORGIAN, J., concurs.
GROSS, J., concurs specially with opinion.

GROSS, J., concurring specially.

I fully concur with the majority opinion and write to highlight a recurring problem that arises when the language of a Confrontation Clause analysis finds its way into case law or argument pertaining to the interpretation of a statutory exception to the rule against hearsay.

The rule against hearsay provides that "[e]xcept as provided by statute, hearsay evidence is inadmissible." § 90.802, Fla. Stat. (2018). "This means that the only exceptions to the hearsay rule in Florida are the ones

13

recognized by statutes such as sections 90.803, 90.804, and 90.805, Florida Statutes." *Mortimer v. State*, 100 So. 3d 99, 102 (Fla. 4th DCA 2012). Many of the traditional common law exceptions to the hearsay rule are contained in sections 90.803 and 90.804.

One reason that exceptions to the hearsay rule "usually are justified" is "that the evidence meeting the requirements of exception possesses special reliability (greater than hearsay generally)." McCormick's Handbook of the Law of Evidence § 262 (Edward W. Cleary ed. 2d ed. 1972). Section 90.803 exceptions "contain sufficient guarantees of reliability, [so] they apply even though the declarant is available to testify but is not called." Charles W. Ehrhardt, *Florida Evidence* § 803 (2012 ed.). Section 90.804 exceptions "have historically been treated as not possessing the same reliability as the section 90.803 exceptions and are applicable only when there is a greater showing of need, e.g., the declarant is unavailable." *Id.*

Evaluations of a hearsay exception under the Confrontation Clause of the Sixth Amendment often use language similar to the language providing the justification for the exception. "[H]earsay rules and the Confrontation Clause are generally designed to protect similar values and 'stem from the same roots.'" *White v. Illinois*, 502 U.S. 346, 353 (1992) (internal citations omitted).

Prior to *Crawford v. Washington*, 541 U.S. 36 (2004), to analyze the impact of the Confrontation Clause upon hearsay testimony, the Supreme Court adhered to the

> general framework, summarized in *Ohio v. Roberts*, 448 U.S. 56 (1980), that the veracity of hearsay statements is sufficiently dependable to allow the untested admission of such statements against an accused when (1) "the evidence falls within a firmly rooted hearsay exception" or (2) it contains "*particularized guarantees of trustworthiness*" such that adversarial testing would be expected to add little, if anything, to the statements' reliability.

*Lilly v. Virginia,* 527 U.S. 116, 124–25 (1999) (emphasis supplied).

The notion of "particularized guarantees of trustworthiness" is almost identical to the idea of "sufficient guarantees of reliability," which appears in discussions of the justification for a hearsay exception. In arguments for the admission of testimony under a hearsay exception, I have often seen the contention that the evidence should be admitted because it

contains "particularized guarantees of trustworthiness," based on the facts of the case.[6]

This argument confuses the analysis of admissibility under a hearsay exception. A hearsay exception *exists* because of "sufficient guarantees of reliability." To decide admissibility under a hearsay exception, reference should be made to the language of the statutory exception and not to the more general, case-by-case approach that would admit testimony based upon "particularized guarantees of trustworthiness." Such an approach would allow hearsay exceptions to swallow the rule against hearsay. As the Supreme Court noted in *Crawford*, the application of the *Roberts* framework quoted above, allowed courts to "routinely" admit "accomplice confessions implicating the accused," "core testimonial statements that the Confrontation Clause plainly meant to exclude." 531 U.S. at 63-64.

The majority opinion properly focuses on the language of section 90.804(2)(c) to decide that the declarant's out-of-court statement implicating the accused falls outside of the statutory exception. This is not a case where the statement tended to expose the declarant to criminal liability and was "offered to exculpate the accused," so that consideration of "corroborating circumstances" that showed the "trustworthiness of the statement" would be appropriate. § 90.804(2)(c), Fla. Stat. (2018).

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***

---

[6] Another example of the confusion between a hearsay and Confrontation Clause issue is *Phillips v. State*, 238 So. 3d 845, 845-46 (Fla. 4th DCA 2018) (Gross, J., specially concurring). There, the trial counsel made a hearsay objection in the trial court but appellate counsel raised a Confrontation Clause issue on appeal, not the hearsay issue preserved by trial counsel's objection.